UNITED STATES of America, Plaintiff–Appellee,

v.

Stephen F. ELLENDER, Jim Swope, Roger Dale Collins, and Jim Bourgeois, Defendants–Appellants.

UNITED STATES of America, Plaintiff–Appellee,

v.

Carl TANGREDI, Defendant–Appellant.

Nos. 90–4403, 90–4475.

United States Court of Appeals, Fifth Circuit.

Nov. 12, 1991.

---

Patricia A. Thomas, Abbeville, La. (court-appointed), for Ellender.

J. Lomax Jordan, Jr., Lafayette, La. (court-appointed), for Swope.

Michael C. Piccione, Sr., Lafayette, La. (court-appointed), for Collins & Bourgeois.

William J. Flanagan, Josette L. Cassiere, Asst. Attys. Gen., Shreveport, La., for U.S.

J. Gary Trichter, Houston, Tex. (court-appointed), for C. Tangredi.

Before CLARK, Chief Judge, REAVLEY and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge.

These appeals are the remnants of an ambitious drug prosecution involving a cast of 187 defendants, scores of witnesses, numerous sailing vessels, many thousands of pounds of marijuana, and hundreds of kilograms of cocaine. Courtroom spectators heard accounts of great intrigue spanning several years and involving colorful characters, including a certain deposed Central American dictator. Twenty-three defendants, less than a sixth of the named defendants, were eventually tried. As the dust settled in the specially-modified courtroom, only a handful of defendants stood convicted. The low ratio of convictions to the number of defendants tried, plus the very small sentences against those convicted, best demonstrate the flaw in the government's apparent assumption that "bigger is better" in this type of proceeding.

Five defendants have appealed. We find no reversible errors in the points they have raised, although we must remand Ellender's double jeopardy claim for further investigation in light of *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990).

## BACKGROUND

Nearly a decade ago, Stephen Kalish, Leigh Ritch, and Micheal Vogel, joined forces to import approximately 35,000 pounds of marijuana into North Carolina. The plan went awry when the U.S. Coast Guard seized the ship off the Carolina coast. Undaunted, the group repeated the plan a few months later and successfully imported 40,000 to 50,000 pounds of marijuana. Encouraged by their success in avoiding law enforcement agents, Kalish and his associates planned and executed a quarter-million pound shipment of marijuana in 1983.

Kalish had joined the ranks of the drug running elite and required a safe haven for his many millions. General Manuel Antonio Noriega was only too happy to extend the use of Panamanian banks to Kalish. As Kalish's drug smuggling acumen grew and as his profits swelled, so did his ambition. He and his cohorts began staging early preparations for a one million pound marijuana shipment, and he added a new product line—cocaine—to his distribution system.

Appellant Ellender introduced Kalish to Ellender's uncle, who supplied the *Lady Mauricette*, a shrimp boat used to bring the load of marijuana which was seized by the Coast Guard. An able sailor, Ellender acted as the ship's engineer on the *Jason Lee*, another shrimp boat used to transport the second marijuana shipment, which was successfully unloaded and sold. Ellender assisted in the construction modifications necessary to prepare the *Jason Lee* for its new role as a marijuana transport. Ellender was among those detained after the Colombian Navy seized the ship in Colombian waters. After payment of a bribe, Ellender was released and the operation continued unhindered.

Appellant Swope was also a crew member, beginning with the third importation, transported on the *Bulldog*, a tugboat/barge combination. Swope joined the crew while the barge was en route to Louisiana. After the marijuana was unloaded, Swope remained with the *Bulldog*. Swope was later questioned by a Customs Officer because the tug and barge had not cleared through U.S. Customs. After urging the officer to return later to meet with the tug's captain, Swope warned Kalish of the contact and fled the area with other crew members.

Kalish teamed up with Cesar Cura, a cocaine supplier from Medellin, Columbia, and Albert "Chic" Fortna. Kalish and Fortna agreed to transport cocaine from Cura's Colombian sources to Cura's wholesalers in the United States. In exchange, Kalish and Fortna retained twenty percent of the cocaine. Fortna would then sell their portion of the cocaine through his distributors and he and Kalish would split the profits. Kalish and Fortna forecast net profits of three million dollars per shipment, with an anticipated eventual volume of one shipment every ten to fourteen days.

Appellants Collins and Bourgeois each received four or five kilograms of cocaine from the first consignment. Each dealt through Fortna, who claimed to have been a long-time supplier to the pair. Fortna also stored some of the cocaine at a ranch property leased by Collins. Fortna later testified that Bourgeois balked when he attempted to interpose another distribution associate between himself and Bourgeois.

Ultimately, the group completed only one cocaine importation. The first shipment was plagued by adverse weather, necessitating an emergency landing in Jamaica, where Jamaican government officials stole a substantial amount of the cocaine and extracted a hefty bribe. The second flight fell prey to mechanical trouble, and plans for the third were terminated with the arrest of Stephen Kalish on July 26, 1984, on unrelated charges. Appellant Tangredi was implicated in the second and third failed shipments for his agreement to assist in unloading cocaine in Lubbock, Tex-

as, a designated backup destination had the second and third importations occurred. Kalish's arrest also curtailed preparations for the planned million-pound marijuana scheme. Later, Kalish became a key witness for the prosecution in a number of drug related trials, including the instant case. He was joined as a government witness by his former partner, Albert Fortna.

The original indictments were superseded as new defendants and charges were added. The charges in the final indictment were separated into two trials. The first trial, which began on October 16, 1989, and ended on January 15, 1990, covered the marijuana charges. The second trial commenced on February 12, 1990, and ended on March 7, 1990, and covered the cocaine charges. Numerous witnesses and exhibits were presented, creating an appellate record of some eighty volumes.

Ellender and Swope were charged with thirteen counts related to a conspiracy to import, possess, and distribute marijuana, in violation of 21 U.S.C. §§ 841, 846, 952, 955, and 963. (counts one through thirteen).[1] Swope was also charged with conspiring to violate the Travel Act and two substantive Travel Act violations (counts fourteen, twenty-one, and twenty-two). 18 U.S.C. §§ 371, 1952. The jury found Ellender guilty on counts one through six, and not guilty on counts seven through thirteen. Swope was found guilty on counts one through fourteen, twenty-one, and twenty-two.

Collins and Bourgeois were charged with five counts related to a conspiracy to import and distribute cocaine (counts twenty-four through twenty-seven), 21 U.S.C. §§ 841, 846, 952, and three substantive customs violations (counts twenty-eight through thirty). 18 U.S.C. § 545, 19 U.S.C. §§ 1459, 1461, 1484, 1485. Tangredi was also charged in two cocaine importation and distribution counts (counts twenty-three and twenty-five). 21 U.S.C. §§ 841, 952, 963. Before the second trial began the court granted the government's motion to dismiss counts twenty-four, twenty-six, twenty-eight, twenty-nine, and thirty. The court dismissed count twenty-seven. The jury found Collins and Bourgeois guilty on count twenty-five, and found Tangredi guilty on counts twenty-three and twenty-five.

The appellants present several points of error. Each defendant asserts that the court abused its discretion in denying his respective motion for severance. Ellender and Swope both complain that the indictment was impermissibly vague, the discovery process was flawed, and that the trial was contaminated with prosecutorial misconduct. Ellender additionally alleges that the evidence established multiple conspiracies rather than the single conspiracy charged, his conviction violated the Double Jeopardy Clause, and that the court erred in ordering him to be shackled throughout the trial. Swope also contends that the evidence was insufficient to sustain his conviction. Collins further argues that he was substantially prejudiced by the court's limitation on cross-examination, and that he should have been granted a new trial. We now discuss these claims in turn.

## SEVERANCE

Ellender, Swope, and twenty-one other defendants were tried together on charges of conspiracy to import over one million pounds of marijuana in four operations. The trial lasted approximately three months and seventy-three witnesses testified. Ellender and Swope argue that they were prejudiced by the "spill-over" effect of the evidence presented against their co-defendants, which they claim was not relevant to the charges brought against them. They also argue that the court should have granted them separate trials because they could have been tried in a few days and the three month trial was unduly burdensome. Tangredi makes essentially the same assertions, though he was tried in the smaller cocaine phase of the trial rather than in the marijuana phase.

---

1. The original indictment was twice superseded. Reference herein is to the third, and final, indictment.

We review the district court's denial of a motion for severance for an abuse of discretion. *United States v. DeVarona*, 872 F.2d 114, 120 (5th Cir.1989); *United States v. Wheeler*, 802 F.2d 778, 781 (5th Cir.1986), *cert. denied*, 480 U.S. 908, 107 S.Ct. 1354, 94 L.Ed.2d 524 (1987). To successfully show abuse of discretion in denial of a severance motion an appellant must first demonstrate that the joint trial resulted in compelling prejudice against which the trial court's protective measures were ineffective. *United States v. Hogan*, 763 F.2d 697, 705 (5th Cir.1985); *United States v. Mota*, 598 F.2d 995, 1000 (5th Cir.), *cert. denied sub nom Flores v. United States*, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1979). The appellant must further show that the prejudice was not outweighed by concerns of judicial economy. *DeVarona*, 872 F.2d at 120–21. *See also* Fed.R.Crim.P. 14.

The Federal Rules of Criminal Procedure provide for joint trial of defendants alleged to have participated in the same criminal "act or transaction or in the same series of acts or transactions." Fed. R.Crim.P. 8(b). Joinder of defendants is appropriate when it will facilitate justice or promote judicial economy. *See Richardson v. Marsh*, 481 U.S. 200, 209–10, 107 S.Ct. 1702, 1708–09, 95 L.Ed.2d 176 (1987); Goldsmith, *RICO & Enterprise Criminality: A Response to Gerard E. Lynch*, 88 Colum.L.Rev. 774, 799–800 (1988). Generally, defendants charged in a single indictment should be tried together. *United States v. Arzola–Amaya*, 867 F.2d 1504, 1516 (5th Cir.), *cert. denied*, 493 U.S. 933, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). Joinder of defendants is particularly appropriate when conspiracy is one of the charges. *Wheeler*, 802 F.2d at 782.

The government's aspirations of conducting a megatrial were limited only by the physical bounds of courtroom walls. Each defendant and attorney was limited to a small writing space crowded into a block-seating arrangement. Bleachers were installed. Seating charts were issued to jurors and trial participants to facilitate identification. A special intercom system of dubious efficacy was installed for "bench conferences." When an attorney wished to address the court and fellow counsel privately, the jurors were treated to background music. However, this intended distraction proved futile, and counsel turned to the time-honored method of hushed voices and bowed heads. In sum, the courtroom assumed the appearance of an overcrowded classroom.

We echo concerns regarding conduct of criminal megatrials expressed by the Second Circuit in *United States v. Casamento*, 887 F.2d 1141, 1151–52 (2nd Cir.), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1989). Exceedingly long trials impose substantial burdens on the trial court, attorneys, defendants, support personnel, and particularly on jurors. Indeed, this case required the services of numerous court-appointed counsel, many of whom were drawn away for an extended period from other clients and matters, and who sat silently while awaiting some reference to their respective clients. Significant additional costs were incurred in the modification of the courtroom and the installation of "temporary" furnishings. Many in the room were relegated to plank-type bleachers, suitable perhaps for enjoying an afternoon of football, but of questionable propriety for a protracted trial. While sizable joint trials may be an efficient use of judicial resources, and may promote the interests of justice, these are not the only yardsticks by which a decision to allow a megatrial must be measured. *Casamento*, 887 F.2d at 1151–52. *See generally* Annual Judicial Conference of the Second Judicial Circuit, *The Problems in the Trial of "Monster" RICO Cases*, 125 F.R.D. 234 (1988); Note, *No Easy Solutions to the Problem of Criminal Megatrials*, 66 Notre Dame L.Rev. 211 (1990) (acknowledging the many complications of conducting a megatrial and criticizing the *Casamento* proposed guidelines).

The appellants have uniformly criticized the choreography of the trial proceedings without heeding the standard of review to which we are bound. Appellate arguments must rest upon the trial record, directing the Court to particulars which support each

claim. Meticulous advocacy is required to isolate events occurring in the course of a joint trial and then to demonstrate that such events caused substantial prejudice. Mere generalized criticism of megatrials generally will not withstand the rigorous standard of review for denial of severance. Distillation of appellants' arguments produces allegations that each appellant's conviction was improperly influenced by "spillover" prejudice and juror confusion. Appellants contend that their causes were poisoned by repeated references to Colombian drug lords and former-General Manuel Noriega.

At the beginning of both trials the jurors were provided with a copy of the final indictment, a seating chart, and note-taking materials. At the time he charged the juries, the trial judge issued each juror a written copy of the jury charge. The court instructed each jury to separately consider the evidence against each individual defendant. The jury deliberated for five days during the first trial, pausing at times to request further instructions from the trial judge. The jury in the second trial, involving only five defendants, deliberated for two days, and asked for the use of a chalkboard to assist them in their deliberations. The jury fully acquitted most of the defendants, and acquitted Ellender on several counts.[2]

"Appropriate cautionary instructions can decrease the possibility that the jury will improperly transfer proof of guilt from one defendant to another." *Hogan,* 763 F.2d at 705. Further, acquittals as to some defendants on some counts support an inference that the jury sorted through the evidence and considered each defendant and each count separately. *United States v. Acosta,* 763 F.2d 671, 697 (5th Cir.), *cert. denied sub nom Weempe v. United States,* 474 U.S. 863, 106 S.Ct. 179, 88 L.Ed.2d 148 (1985). The court's cautionary instructions adequately charged the jury as to their responsibility to segregate the evidence of-

fered against each defendant. No evidence shows that the jury failed in this responsibility, and we presume that the jury followed the cautionary instructions. *Richardson,* 481 U.S. at 211, 107 S.Ct. at 1709. The appellants have not established the compelling prejudice necessary to succeed on this claim.

## SUFFICIENCY OF THE INDICTMENT

██ Ellender contends that the indictment does not conform to Federal Rule of Criminal Procedure 7(c)(1), which requires "a plain, concise and definite written statement of the essential facts constituting the offense charges...." Ellender argues that the indictment failed to set forth the time, location, and circumstances of the alleged conspiracy with sufficient specificity to allow him to prepare a defense. We measure the sufficiency of an indictment "by whether (1) each count contains the essential elements of the offense charged, (2) the elements are described with particularity, without any uncertainty or ambiguity, and (3) the charge is specific enough to protect the defendant against a subsequent prosecution for the same offense." *United States v. Lavergne,* 805 F.2d 517, 521 (5th Cir.1986) (*citing United States v. Gordon,* 780 F.2d 1165, 1171–72 (5th Cir. 1986)). To comply with Rule 7(c), an indictment need not provide the evidentiary details of the government's case. *Id.*

The indictment in this case sets forth the essential elements of the alleged offenses. Ellender, however, contends that the indictment language "commencing in or about the month of July, 1982, and continuing through the month of August, 1984 ... " is insufficient to establish the time of the alleged conspiracy. Ellender also argues that the language "in the Western District of Louisiana, and elsewhere," is insufficient to establish the location of the conspiracy.[3] In *Lavergne,* we sustained an

---

**2.** Ellender also argues that he was entitled to a severance because he was only involved in the first two smuggling operations. The government, however, alleged that all four operations were part of one continuous conspiracy. There-

fore, the evidence concerning the last two operations was relevant to Ellender's case.

**3.** In a closely-related claim, Ellender and Swope contend that the district court abused its discretion by denying their motions for a bill of par-

indictment that "allege[d] no facts other than the conclusion that appellants embezzled a particular sum of money during a particular time frame." 805 F.2d at 521. Similarly, in *United States v. Giles,* 756 F.2d 1085, 1086–87 (5th Cir.1985), this Court held that an indictment was sufficient when it charged the defendant with conspiring to distribute drugs "on or about April, 1981, and continuing through August, 1982, in Harris County, in the Southern District of Mississippi, and elsewhere." The precise dates on which the appellant committed the alleged acts are not necessary. *Id.*

The language of the indictment in this case closely tracks the language approved in *Giles.* Further, the indictment alleged a conspiracy to import a specific amount of marijuana, 1,260,000 pounds, during a specified period. In harmony with our holdings in *Giles* and *Lavergne, supra,* we hold that this indictment set forth the charged offenses with sufficient particularity to satisfy the requirements of Rule 7.

## DISCOVERY

Ellender and Swope contend that the government violated several discovery orders by refusing to provide certain materials and by providing other materials after the date ordered by the district court. The defendants filed a motion to dismiss the indictment based on the government's alleged discovery violations, and the court denied that motion. The court ordered the government to produce all material discoverable under 18 U.S.C. § 3500 (Jencks Act), *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), seven days before trial. The government was three

days tardy in complying, although a few documents were produced even later. Ellender and Swope have not articulated any specific violations of Federal Rule of Criminal Procedure 16.

Rule 16 establishes parameters of discoverable evidentiary material. The trial court holds great latitude in the management of the discovery process, including fashioning the appropriate remedy for alleged discovery errors. Fed. R.Crim.P. 16(d)(2). We review alleged errors in the administration of discovery rules under an abuse of discretion standard and will not reverse on that basis unless a defendant establishes prejudice to his substantial rights. *United States v. Garcia,* 917 F.2d 1370, 1374 (5th Cir.1990) (citations omitted).

To succeed on a *Brady* claim, a defendant must establish (1) that evidence was suppressed; (2) that this evidence was favorable to the accused; and (3) that the evidence was material either to guilt or punishment. *Smith v. Black,* 904 F.2d 950, 963 (5th Cir.1990) (citations omitted). "[T]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *United States v. Garcia,* 917 F.2d 1370, 1375 (5th Cir. 1990).

Ellender contends that the government refused to provide a copy of his prison record. Ellender contends that this record was *Brady* material because it established that he has been incarcerated

---

ticulars. "The denial of a bill of particulars is within the sound discretion of the trial judge; this Court can reverse only when it is established that defendant was actually surprised at trial and therefore was prejudiced in his substantial rights." *Lavergne,* 805 F.2d at 520 (quoting *United States v. Montemayor,* 703 F.2d 109, 117 (5th Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1984)). The government contends that they provided a great deal of the information requested in the motion for a

bill of particulars in response to *Brady,* Jencks Act, and Rule 16 motions. Ellender and Swope do not contend that they were prejudicially surprised by evidence presented at trial. Their argument is essentially a repeat of their contention that the indictment was insufficient. They argue that the indictment could have been cured by a bill of particulars. However, they failed to establish that the indictment was insufficient or that they were prejudicially surprised by the denial of their motion for a bill of particulars.

since 1982 and thus could not have participated in the later smuggling operations. The government responds that these records were not exculpatory and were easily available to Ellender through other sources. Ellender has not argued, nor can he fairly, that the government suppressed his prison record. Thus, this claim fails at the first step of the *Smith v. Black* analysis.[4] Moreover, Ellender could have easily subpoenaed the pertinent prison records. We have held that where the defendant's own lack of reasonable diligence is the sole reason for not obtaining the pertinent material, there can be no *Brady* claim. *United States v. Brown*, 628 F.2d 471, 473 (5th Cir.1980).

■ Swope contends that the government violated *Brady* by failing to disclose government witness Doug Tull's psychiatric record, which Swope could have used to impeach Tull. The "record" that the government allegedly did not disclose was a letter from Tull's psychiatrist detailing Tull's treatment from March 28, 1988, to October 15, 1988. The government contends that any failure to disclose this letter did not prejudice Swope because he could still discredit Tull through cross-examination. This letter qualifies as impeachment material and therefore *Brady* required the government to disclose it to Swope. However, a *Brady* violation does not require reversal if the defendant was not prejudiced by the nondisclosure and could adequately prepare a defense. *Garcia*, 917 F.2d at 1375. Further, Swope has failed to establish that this letter was material to his defense.[5] *See id.* Swope knew of Tull's psychiatric treatment and could have raised this issue on cross-examination. Further, the letter merely outlines Tull's course of treatment for severe depression, it does not establish that he was delusional or prone to fabricate. Finally, the court reviewed Tull's medical record *in camera* and determined that Tull was competent. Swope has not established a "reasonable probability"

that the result of the trial would have been different if he had received this letter.

■ Swope also contends that the government violated *Brady* by failing to produce three letters to a federal judge in Florida concerning Kalish's cooperation with the government. The government admits that these letters had impeachment value and were within the scope of *Brady*. Even though the government did not produce these letters until some time after the trial started, the defendants had copies of the letters six weeks before Kalish testified. Six weeks is sufficient time to prepare to impeach a government witness. Swope was not prejudiced by the timing of the production of these letters.

■ Finally, Ellender and Swope contend that the indictment should have been dismissed because the government did not provide Jencks Act materials on time. Ellender and Swope argue that the court ordered the government to provide these materials seven days before trial, and the government did not produce the documents until four days before the trial. Although Ellender and Swope argue that these materials were too voluminous to review immediately before trial, they did not seek additional time to review these materials. The government contends that because it took two weeks to select a jury the defendants had sufficient time to review these materials and were not prejudiced by the delay. It is unlikely that the result of the trial would have differed if the government had produced these materials three days earlier.

The appellants failed to request additional time for review of the material provided, although a joint motion for dismissal of the indictment as a discovery sanction was filed after the trial began. In reviewing a claim of discovery rule violation, "[f]ailure to object or to request a continuance to meet effectively material subject to dis-

4. We need not reach the question of whether Ellender's prison record might be deemed to be exculpatory and express no opinion on the matter.

5. Swope has also failed to show that the letter was suppressed by the government. The letter had been introduced in an October 15, 1988, detention hearing, and was part of the public case record.

covery weighs against a defendant when the prejudice complained of on appeal could have been corrected by originally drawing the court's attention to the matter during the trial." *Garcia,* 917 F.2d at 1374. The potential for mischief inherent in dumping massive documents at counsel's doorstep only days before trial and amid last minute trial preparations is exacerbated when such a maneuver precedes a megatrial. Nonetheless, the appellants have not demonstrated the necessary prejudice to their substantial rights, *id.,* and we do not find that the court abused its discretion in denying the motion to dismiss the indictment.

## PROSECUTORIAL MISCONDUCT

Ellender contends that the prosecutor's comments in her closing argument deprived him of a fair trial. Ellender objects, for the first time on appeal, to two statements in the prosecutor's closing argument. First, Ellender argues that the prosecutor's reference to his 1982 conviction on unrelated drug charges in Mobile, Alabama, was false and designed to mislead the jury. Ellender states that he introduced evidence of the 1982 Alabama conviction to establish that his involvement in the conspiracy ended with his arrest. However, he now argues that the prosecutor stated that he was convicted for "something besides what he is on trial for today" to prevent the jury from realizing that he had already been convicted in North Carolina for the drug smuggling operations that formed the conspiracy in this case. We find no merit in this contention. Ellender never conclusively established that he had already been convicted for these smuggling operations and the prosecutor's argument clearly refers to his 1982 Alabama conviction, which he admits he introduced into evidence.

▆▆▆ Ellender also objects to the prosecutor's statement that while he was in jail he took no steps to disavow his association with Kalish and the conspiracy, but instead "told Steve Kalish, keep on trucking. He told Steve Kalish, save the bales. That's the message he sent out from his jail cell." Ellender argues that this statement was a deliberate attempt to make the jury believe there had been actual communication between Kalish and Ellender, when there was no evidence of any communication between them.

▆▆▆ This argument is also meritless. A review of the record demonstrates that these statements, read in context, do not imply actual communication between Kalish and Ellender. When considered with the prosecutor's other statements about Ellender's "message to society," they were intended to have a general meaning. To determine whether a prosecutor's arguments deprived a defendant of a fair trial, we review the prosecutor's comments "in light ... of the magnitude of the prejudicial effect of the statements, the efficacy of any cautionary instructions, and the strength of the evidence of the defendant's guilt." *United States v. Weeks,* 919 F.2d 248, 254 (5th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1430, 113 L.Ed.2d 481 (1991) (*quoting United States v. Jones,* 839 F.2d 1041 1050 (5th Cir.), *cert. denied,* 486 U.S. 1024, 108 S.Ct. 1999, 100 L.Ed.2d 230 (1988)). This already narrow standard of review is further tightened by the plain error standard that Ellender must satisfy because he did not object at trial to the allegedly offensive prosecutorial statements. In this case, the prosecutor's comments hardly prejudiced Ellender, much less amounted to plain error. The court instructed the jury to consider only the evidence and that the attorneys' arguments were not evidence. Further, there is substantial evidence linking Ellender to the conspiracy. The prosecutor's comments were not reversible error.

## MULTIPLE CONSPIRACIES THEORY

▆▆▆ The indictment charged that all defendants were part of one elaborate conspiracy spanning a little more than two years. Ellender contends that the four smuggling operations were really four separate conspiracies. Ellender argues that he could not have been a part of the latter two operations because he was arrested before they began. The essence of Ellender's argument is that the evidence does

not support the jury's finding that the four operations were part of one large conspiracy.

Whether the evidence establishes a single or multiple conspiracies is a question of fact for a jury to decide, *United States v. Erwin*, 793 F.2d 656, 662 (5th Cir.), *cert. denied*, 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986) (citations omitted), which must be upheld if the facts adequately sustain the conclusion. In reviewing a claim of multiple conspiracies, we consider (1) the time frame; (2) the locations of the events charged as part of the conspiracy; (3) the persons acting as co-conspirators; (4) the statutory offenses charged in the indictment; and (5) the overt acts or other description of the offense charged that indicate the nature and scope of the activity that the government seeks to punish in the case. *United States v. Stricklin*, 591 F.2d 1112, 1122 (5th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979) (quoting *United States v. Marable*, 578 F.2d 151, 154 (5th Cir. 1978)).

The court provided lengthy and adequate instructions to the jury on the single versus multiple conspiracies theories. The court instructed the jury that they must find that the defendants had participated in one conspiracy, or they must return a verdict of not guilty. The jury found some of the defendants guilty on the conspiracy counts, therefore they necessarily found that the government proved the existence of one conspiracy. The alleged conspiracy continued for over two years. Each operation was completed before the next began, except for the distribution phases. The leaders of the conspiracy were Kalish, Ritch, and Vogel, although Vogel did not remain involved throughout the entire conspiracy. The distribution level conspirators remained the same throughout the conspiracy. Each venture involved the same or similar statutory offenses. The profits from one venture were invested into the next venture, the same surveillance and security measures were employed, and much of the equipment was reused in subsequent operations. However, the conspirators used different means to import the marijuana, and purchased the drugs from different suppliers. Based on these facts, the evidence was sufficient for a rational jury to conclude that the government had established the elements of a single conspiracy beyond a reasonable doubt. *See United States v. Gonzales*, 866 F.2d 781, 783 (5th Cir.), *cert. denied*, 490 U.S. 1093, 109 S.Ct. 2438, 104 L.Ed.2d 994 (1989).

## DOUBLE JEOPARDY

Ellender contends that he pleaded guilty in the Eastern District of North Carolina to charges based on two marijuana smuggling operations that occurred in North Carolina. These operations are part of the conspiracy for which he was charged in this case. Therefore, Ellender argues that his conviction based on these operations violates the prohibition against double jeopardy. Ellender filed a motion *in limine* in the district court arguing that all evidence of the first two smuggling operations that occurred in North Carolina should be excluded. The court construed this as a motion to dismiss based on double jeopardy, but denied the motion as meritless.

To prevail on a motion to dismiss based on double jeopardy, the defendant must come forward with a *prima facie* non-frivolous double jeopardy claim. *United States v. Levy*, 803 F.2d 1390, 1393–94 (5th Cir.1986). The government must then establish, by a preponderance of the evidence, that the defendant has been charged with separate offenses. *Id.* (citing *Stricklin*, 591 F.2d at 1117–18). The defendant can establish a *prima facie* non-frivolous double jeopardy claim through indictments or other documentation to establish the earlier charges, or even through his own testimony. *Stricklin*, 591 F.2d at 118. The government argues that Ellender completely failed to establish a *prima facie* non-frivolous double jeopardy claim because he offered no. proof of his guilty pleas, other than assertions of counsel. Ellender did not testify that he had pleaded guilty to the first two operations in North Carolina, and there are no documents at-

tached to his brief or motion *in limine* to establish his claim.

At oral argument, Ellender contended that he had introduced documentary evidence of his guilty pleas to charges related to the first two marijuana importations. We directed counsel to further brief this issue. Ellender has presented the Court with exhibits showing that documentary evidence of his North Carolina indictment, guilty plea and incarceration were proffered, though not admitted at trial. Ellender has effectively refuted the government's claim that he submitted no evidence other than assertions of counsel. However inartfully it may have been stated or presented, Ellender raised a *prima facie* claim of double jeopardy. As the evidence was not developed on Ellender's double jeopardy claim we must remand his case for that purpose. The district court's inquiry will be guided by *Grady v. Corbin, supra*, the recent Supreme Court case construing the double jeopardy clause.

## SHACKLING

 Ellender contends that the district court erred by allowing certain defendants, including himself, to be tried in shackles. According to Ellender, the U.S. Marshal's Service decided that certain defendants should be tried in shackles. Ellender argues that he was denied due process by this decision because the court did not hold a hearing on the issue, and because the jury knew that some defendants were shackled. The decision that certain defendants must be tried in shackles is committed to the discretion of the trial judge and will only be reversed for an abuse of discretion. *Weeks*, 919 F.2d at 250. The court may rely heavily on the U.S. Marshal's advice when deciding whether defendants should be shackled during trial. *Id.* (*quoting United States v. Samuel*, 431 F.2d 610, 615 (4th Cir.1970) *cert. denied*, 401 U.S. 946, 91 S.Ct. 964, 28 L.Ed.2d 229 (1971)).

In this case, the court stated "If the Marshal's Service feels that any detainee should be shackled, they will be shackled." This statement does not indicate that the Marshal decided which defendants would be shackled, it merely established that the court relied on the Marshal's advice in deciding whether the defendants should be tried in shackles. Ellender does not contend that the jury actually saw that certain defendants were wearing shackles, instead he argues that because certain defendants did not move around during the trial the jury must have known they were shackled. The court ordered several precautionary measures to prevent the jury from realizing that some of the defendants were shackled. The defendants entered and exited the courtroom when the jury was not present, the shackles were wrapped to prevent noise, and no one would stand when the jury entered the room. These measures were sufficient to prevent the jury from seeing or hearing the shackles. Moreover, there appears good reason for shackling Ellender. According to documents proffered by Ellender's counsel, Ellender participated in an escape attempt. The court did not abuse its discretion by relying on the advice of the U.S. Marshal's Service and requiring certain defendants to stand trial in shackles.

## SUFFICIENCY OF THE EVIDENCE

 Swope contends that the district court erred by denying his motion for acquittal based on insufficient evidence. Fed.R.Crim.P. 29. In reviewing claims of insufficient evidence, we view the evidence and all inferences reasonably drawn from it in the light most favorable to the jury verdict to determine whether any rational jury could have found the essential elements beyond a reasonable doubt. *United States v. Gonzales*, 866 F.2d 781, 783 (5th Cir.), *cert. denied*, 490 U.S. 1093, 109 S.Ct. 2438, 104 L.Ed.2d 994 (1989). To establish guilt in a drug conspiracy, the government must prove the existence of an agreement to import or to possess with intent to distribute, the defendant's knowledge of the agreement, and his voluntary participation. *United States v. Lewis*, 902 F.2d 1176, 1180–81 (5th Cir.1990). These elements may be established by circumstantial evidence. *Id.*

Swope concedes that the government proved the existence of a drug conspiracy, but contends that the government did not prove that he knew of the conspiracy and took action to further it. Swope argues that the government only presented the testimony of Kalish and Tull to establish his participation in the conspiracy. He argues that their testimony is insufficient to sustain his conviction because these witnesses were not credible. Kalish testified that Swope was hired on the recommendation of other drug traffickers, and that he participated in the off-loading of the third marijuana shipment and the planning of the fourth shipment. Swope contends that Kalish was lying when he testified that he hired Swope to work on the barge used for one shipment of marijuana and paid him $300,000 to $400,000. Swope argues that Kalish's testimony confuses dates, which establishes that Kalish was lying.

Tull testified that he and Swope off-loaded the marijuana and then traveled to Houston from Louisiana. Tull also testified that he delivered Swope's share of the proceeds to Swope's father. Swope contends that Tull's testimony is not credible because Tull had mental problems and could not remember these events. However, as we have noted, the court found Tull to be competent to testify. There was substantial competent evidence linking Swope to the conspiracy. The court did not err in denial of Swope's motion for a judgment of acquittal.

## LIMITATION OF CROSS–EXAMINATION

Collins claims that the court denied his sixth amendment right to confront adverse witnesses by limiting his attorney's cross-examination of Fortna. Collins argues that the cross-examination of Fortna would not have elicited impermissible hearsay and was necessary to impeach Fortna. Collins now argues that he should be granted a new trial to remedy this er-

ror.[6] We review the trial court's rulings on the admissibility of evidence for an abuse of discretion. *United States v. Duncan*, 919 F.2d 981, 985 (5th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 2036, 114 L.Ed.2d 121 (1991). The " '[l]imitation of the scope and extent of cross-examination is a matter committed to the sound discretion of the trial judge reviewable only for a clear abuse of that discretion.' " *Id.* at 988 (quoting *United States v. Gordon*, 780 F.2d 1165, 1175 (5th Cir.1986)). The government contends that Collins was not attempting to impeach Fortna, but was attempting to establish bias. According to the government, Fortna testified that he had heard from several sources that Collins had cooperated with the government in implicating some of his co-defendants. Collins then asked the names of these sources and the government objected on the grounds of relevance. The court sustained this objection because the question called for irrelevant, hearsay, and cumulative testimony. We find no abuse of discretion in the court's ruling.

## CONCLUSION

For the foregoing reasons, the convictions of appellants Swope, Collins, Tangredi, and Bourgeois are AFFIRMED. Appellant Ellender's cause is REMANDED for further consideration of his double jeopardy claim.

---

6. Collins argues, as a separate issue in his brief, that the court erred by denying his motion for a new trial. Collins argues that he is entitled to a new trial because the court denied his motion to sever and limited his cross-examination of Fortna. However, Collins presents no additional argument on this issue.