## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20517

United States Court of Appeals
Fifth Circuit

**FILED**

August 17, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

WARREN DAILEY,

      Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before REAVLEY, HAYNES, and COSTA, Circuit Judges.

HAYNES, Circuit Judge:

Defendant Warren Dailey challenges his conviction for five counts relating to a scheme under which he certified individuals for home health care in exchange for $400 a month. We AFFIRM.[1]

I.

This case arises out of allegations that Dr. Warren Dailey engaged in a conspiracy to defraud Medicare relating to home health care services provided

---

[1] We again strike Dailey's "first amended" Rule 28(j) letter as noncompliant. Even if we were to consider the arguments made in that letter, we reach the same conclusion as to the merits of Dailey's appeal.

## No. 16-20517

by Candid Home Health, Inc. ("Candid"). The Government alleged that Dailey, a physician specializing in family practice, signed documents indicating that patients required home health care when they did not need those services. The Government charged Dailey with (1) conspiracy to commit health care fraud; (2) two counts of aiding and abetting false statements relating to health care matters; (3) conspiracy to pay and receive health care kickbacks; and (4) aiding and abetting the payment and receipt of health care kickbacks.

Prior to trial, the Government filed its notice of intent to call expert witnesses, which identified Lisa Garcia, a registered nurse, as an expert witness. The Government later supplemented this notice to provide additional information about the contents of Garcia's expected testimony. Dailey requested a continuance, arguing that the Government's supplemental notice failed to satisfy Federal Rule of Criminal Procedure 16(a)(1)(G) and that a previously-granted one-week continuance was insufficient for him to obtain a rebuttal expert. The district court denied the motion.

At trial, Lisa Garcia testified as an expert for the Government about general information regarding Medicare and home health care. She testified that common fraud schemes involved home health agencies paying physicians to sign Form 485s[2] for patients with whom the physician had no relationship. She reviewed the billing data for Candid and testified that the data "indicated

---

[2]   A Form 485 is a form used by a home health agency to present a home health certification and a plan of care for a homebound patient. The form is then sent to the physician, who attests to the following certification:

> I certify/recertify that this patient is confined to his/her home and needs intermittent skilled nursing care, physical therapy and/or speech therapy or continues to need occupational therapy. *The patient is under my care*, and I have authorized the services on this plan of care and will periodically review the plan.

(emphasis added).

that there was some aberrant pattern on both the home health agency and the physician." Specifically, the significant amount of repeated home health episodes was a "red flag." She also noted that there was a significant number of referrals from one physician—Dailey. Indeed, his referrals made up almost twenty-four percent of Candid's billing. She testified that this large number of referrals from one physician is "cause for question." Moreover, Garcia noted that many of the patients that Dailey referred were hours away from the location of Candid and Dailey's practice, which cast doubt on whether the patient was actually being seen.

The second witness at trial was Ebelenwa Chudy-Onwuugaje ("Chudy"), who started and operated Candid.[3] Chudy testified she used recruiters to get patients. Chudy paid the recruiters around $400 per patient that they brought to Chudy. The recruiters, in turn, paid the patients. She testified that, when a patient's primary care physician would not sign the Form 485 because the patient did not require home health services, she needed another doctor to sign the forms.

Chudy testified that when she started her own home health agency, she made an appointment with Dailey and spoke to him for less than fifteen minutes. During this meeting, Dailey never questioned Chudy about her company or her educational background. According to Chudy, she and Dailey made an agreement whereby Dave Onuorah, a physician assistant, "would go out to see the patients and once he brings the paperwork, then [Dailey] w[ould] go ahead and sign the 485s and everything," and for which Chudy would pay Dailey $400 a month. The Government entered evidence of monthly checks from Candid to Dailey for $400. This relationship lasted from 2009 until 2011,

---

[3] Chudy pleaded guilty to one count of conspiracy to commit fraud as it related to her operation of Candid.

and during this time Dailey signed 305 Form 485s. For Dailey's certifications, Candid billed Medicare approximately $913,000.

Chudy also testified that if she did not pay him the monthly fee, Dailey would not give her the signed Form 485s. During this two-year period, Chudy never spoke to Dailey about any patient, and Dailey never refused to sign any form. Furthermore, Dailey never prescribed medicine for or conducted any kind of medical review on any of these patients.

Andres Gomez, a federal agent with the Department of Health and Human Services, Office of Inspector General, also testified regarding Medicare and home health care. Gomez investigated Candid, and this process included reviewing their Medicare claims data and interviewing Dailey. In this interview, Dailey initially stated that he did not remember Candid. But Dailey recalled Candid after Gomez showed Dailey the checks he had received from Candid. When Gomez requested the patient charts for some of the patients that Dailey referred to Candid, Dailey responded that he did not have those records. In a subsequent fax, Dailey stated "I do not have custodianship of any of these patients." Gomez testified that it was "very unusual" for a physician not to have patient records.

Several of the patients for whom Dailey signed Form 485s also testified to the effect that they did not require home health care and had no knowledge of Dailey. Some of the patients' primary care physicians also testified that their patients did not require home health care or that they had not prescribed home health care to these patients.

In his requested jury instructions, Dailey requested a definition of "practicing medicine" and "providing care," as well as an explanation of the scope of practice for physician assistants. The district court denied the request.

No. 16-20517

Dailey also filed a motion for judgment notwithstanding the verdict, which was denied. The jury returned a guilty verdict on all five counts.[4]

## II.

We review an Ex Post Facto challenge—an issue of law—de novo. *See United States v. Young*, 585 F.3d 199, 202 (5th Cir. 2009) (per curiam). "We review alleged errors in the administration of discovery rules under an abuse of discretion standard and will not reverse on that basis unless a defendant establishes prejudice to his substantial rights." *United States v. Ellender*, 947 F.2d 748, 756 (5th Cir. 1991).

Where the issue is preserved, we review the sufficiency of the evidence de novo. *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012). When conducting this review, we consider all evidence in the light most favorable to the government, and all reasonable inferences and credibility choices are made to support the jury's verdict. *United States v. Ford*, 558 F.3d 371, 375 (5th Cir. 2009) (per curiam). We will affirm the conviction where a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Id.*

Finally, we review a district court's refusal to include a requested jury instruction for an abuse of discretion, and the district court is afforded substantial latitude in formulating jury instructions. *United States v. Daniels*, 247 F.3d 598, 601 (5th Cir. 2001).

## III.

## A.

In his first issue on appeal, Dailey maintains that the district court erred in denying his motion to dismiss the indictment as violating the Ex Post Facto Clause. As relevant here, "[a] law violates the Ex Post Facto Clause if it []

---

[4] The district court sentenced Dailey to sixty-three months of imprisonment on count one and sixty months of imprisonment on counts two through five, to be served concurrently for a total of sixty-three months, and three years of supervised release.

No. 16-20517

punishes as a crime an act previously committed which was not a crime when done." *United States v. Hickman*, 331 F.3d 439, 445 (5th Cir. 2003). Dailey contends the Ex Post Facto Clause was violated because, at the time he submitted his forms to Candid, he was not required to have a "face-to-face" meeting with a patient to determine if the patient qualified for home health services.[5]

Even assuming that Dailey's understanding of the pre-2011 requirements were correct, there is no Ex Post Facto violation. Dailey was not indicted for failing to have face-to-face meetings with his alleged patients prior to certifying them for home health care. Rather, the conduct underlying his indictment was that he lied on certification forms in exchange for $400 a month. This conduct is illegal regardless of whether he was required to have a face-to-face meeting prior to certification. There is thus no Ex Post Facto violation.

B.

Dailey also argues that the district court erred in permitting Garcia's testimony. Specifically, he argues that the Government failed to comply with Federal Rule of Criminal Procedure 16 when designating Garcia as an expert and that a one-week continuance was insufficient to obtain a rebuttal expert.

We need not address Dailey's argument that the Government was required to produce an expert report under Rule 16(a)(1)(G) because, even assuming such a requirement, Dailey has not explained how he was prejudiced by the omission. *See Ellender*, 947 F.2d at 756. The Government's

---

[5] The face-to-face requirement was added as part of the Patient Protection and Affordable Care Act. *Compare* 42 U.S.C. § 1395f(a)(2)(C) (2010), *with* 42 U.S.C. § 1395f(a)(2)(C) (2011); *see also Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell*, 142 F. Supp. 3d 119, 122 (D.D.C. 2015) ("Whereas previously, physicians needed only to certify that a patient required home-health services, the new law requires them also to 'document' that they have had a 'face-to-face encounter' with the patient within a reasonable timeframe.").

6

No. 16-20517

supplemental notice provided Dailey with the general essence of Garcia's testimony, and Dailey has not explained what additional information he needed about Garcia's testimony to prepare for trial. *See United States v. Dvorin*, 817 F.3d 438, 454 (5th Cir.), *cert. denied*, 137 S. Ct. 140 (2016).

As to Dailey's argument that he needed additional time to call a rebuttal expert witness, he again fails to meet his burden. We have previously explained that, where a party seeks a continuance because a witness is unavailable, the movant must show that (1) he has exercised diligence to obtain the attendance of the witness; (2) the witness will tender substantial favorable evidence; (3) the witness is available and willing to testify; and (4) the denial of the continuance would materially prejudice the movant. *See United States v. Scott*, 48 F.3d 1389, 1394 (5th Cir. 1995). Even assuming that Dailey exercised the requisite diligence, he has failed to establish that there was a witness who was willing to tender favorable evidence. *See id.* Accordingly, the district court did not reversibly err in permitting Garcia's testimony.

C.

Dailey challenges the sufficiency of the evidence for each count of conviction. We address each count in turn.

1.

Count one charged Dailey with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. "To prove conspiracy to commit healthcare fraud, violating 18 U.S.C. § 1349, the government must establish [(1)] the existence of an agreement between two or more people to pursue the offense of fraud; [(2)] the defendant knew of the agreement; and [(3)] the defendant voluntarily participated in the conspiracy." *United States v. Delgado*, 668 F.3d 219, 226 (5th Cir. 2012).

7

No. 16-20517

As to the existence of an agreement, such an agreement need not be formal or spoken, but can be inferred from concert of action. *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012). The evidence at trial was sufficient to establish this first requirement. Chudy testified that there was an agreement that Dailey would sign Form 485s for $400 a month, and this agreement was corroborated with monthly checks from Candid to Dailey.

Dailey essentially argues that there was no proof of his knowledge of the scheme. But there was evidence at trial that undermined this defense. For instance, Agent Gomez testified that Dailey initially stated that he did not remember Candid. *Cf. United States v. Mudd*, 685 F.3d 473, 478 (5th Cir. 2012) ("Inconsistent statements and implausible explanations are among the behaviors previously recognized in this circuit as circumstantial evidence of guilty knowledge."). Furthermore, Chudy testified that Dailey never once contacted her to consult about one of the patients. Dailey also did not have any patient records for these individuals, which would be unusual if he were actually providing medical consulting services. In fact, every patient for whom Dailey certified home health care who testified stated that he or she did not know Dailey and was not under his care. From this evidence, a rational jury could infer that Dailey knew of the fraudulent nature of the agreement he had with Chudy. *See United States v. Murthil*, 679 F. App'x 343, 349–50 (5th Cir. 2017) (per curiam).[6]

Dailey argued that it was lawful under Texas law for him to sign off on the work of a physician assistant. Assuming arguendo this is true and relevant, Dailey failed to comply with Texas law. To rely on a physician assistant's evaluation, the physician assistant must be under the physician's

---

[6] Although *Murthil* is not "controlling precedent," it "may be [cited as] persuasive authority." *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006) (citing 5TH CIR. R. 47.5.4).

No. 16-20517

supervision. 22 TEX. ADMIN. CODE § 185.10 ("The physician assistant shall provide, within the education, training, and experience of the physician assistant, medical services that are delegated by *the supervising physician*." (emphasis added)); 22 TEX. ADMIN. CODE § 185.2. But the evidence at trial showed that Dailey did not supervise the physician assistant at issue.

Dailey again raises the face-to-face requirement as a challenge to his conviction. Again, that requirement is irrelevant to the issue at hand. Despite Dailey's certifications, none of the patients were under Dailey's care. *See United States v. Echols*, 574 F. App'x 350, 352 n.1 (5th Cir. 2014) (per curiam). There was simply no physician-patient relationship. Accordingly, by certifying these individuals for home health care, his conduct was illegal, regardless of any face-to-face requirement.

2.

Counts two and three charged Dailey with making false statements relating to health care matters and aiding and abetting in violation of 18 U.S.C. §§ 1035 and 2. Specifically, the indictment charged that Dailey aided and abetted false statements in forms prepared for services for Carlos Webster and Audrey Wilson. To establish that Dailey made a false statement relating to health care matters, the Government had to prove that (1) the defendant made a materially false, fictitious, or fraudulent statement or misrepresentation; (2) in connection with the delivery of [or payment for] health care benefits; and (3) he did so knowingly and willfully. *See* 18 U.S.C. § 1035.

There was sufficient evidence at trial to support the verdict. Dailey fraudulently signed Form 485s for Webster and Wilson in exchange for $400 a month. Webster and his primary care physician testified that Webster was not homebound. Wilson testified that she was not homebound either. There was no evidence at trial that Dailey had any type of relationship with either

9

No. 16-20517

Webster or Wilson. In fact, they both testified that they had no knowledge of Dailey and had never been his patient.

Dailey's signature was required for Medicare to pay for home health services, and Medicare in fact paid for home health care as a result of his signature. *See* 42 C.F.R. § 424.22 (2010) ("Medicare Part A or Part B pays for home health services *only if* a physician certifies and recertifies the content specified in paragraphs (a)(1) and (b)(2) of this section, as appropriate." (emphasis added)). Dailey's main argument as to these counts is that there was no evidence that he filed a false claim with Medicare on behalf of any of the patients. However, counts two and three were for aiding and abetting, and his actions in signing the forms aided and abetted Chudy's filing of the false claims. *See United States v. Mitchell*, 792 F.3d 581, 583 (5th Cir. 2015) (per curiam).

3.

Count four charged Dailey with conspiracy to pay and receive health care kickbacks in violation of 18 U.S.C. § 371. Count five charged aiding and abetting the payment and receipt of health care kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(l)[7] and 18 U.S.C. § 2. The jury returned a guilty verdict

---

[7] The Anti-Kickback Statute prohibits:

> knowingly and willfully solicit[ing] or receiv[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C.A. § 1320a-7b(b)(1).

for both conspiracy and receiving kickbacks. Dailey's sole argument as to counts four and five is that he never referred a patient, but that the patients involved in the scheme "were already signed up with Candid Home Health, Inc. long before their documentation and Form 485 were received by Dr. Dailey."

Because the jury was charged only under Subsection (b)(1)(A), the issue is whether the $400 a month for signing Form 485s can legally constitute a "referral" of an individual for the purposes of furnishing a service for which payment may be made under Medicare. We conclude that it does. *See United States v. Patel*, 778 F.3d 607, 609, 612–18 (7th Cir. 2015) (disagreeing with the doctor's argument that he could not be liable for kickbacks because the "patients independently chose [the provider]" given that he participated in a kickback scheme to sign referrals to that provider).

By signing the Form 485s in exchange for a kickback, Dailey was authorizing care by a particular provider, Candid, and was therefore "referring" the patients to that provider. Dailey's signatures ultimately determined "*whether* his patients could go to [Candid] at all," and he thereby acted as a gatekeeper to federally reimbursed care.[8] *Id.* at 616; *see also United States v. Miles*, 360 F.3d 472, 480 (5th Cir. 2004) (noting that the physician is

---

[8] That referrals to recruiters for recertification are considered kickbacks also undercuts Dailey's argument. Dailey essentially maintains that his conduct was not a referral because these patients had already been captured by Candid. But if that were the case, then referral fees to recruiters for "recertification" would not be kickbacks because those patients had already been captured by Candid. *See United States v. Vernon*, 723 F.3d 1234, 1256 (11th Cir. 2013) (noting that such an interpretation "would lead to the absurd result that the first kickback payment for a referral is unlawful, but future kickback payments for the same patient are lawful because they are not for an initial 'referral'"); *see also Patel*, 778 F.3d at 616 ("Such a result is undesirable because the possibility of a kickback for each recertification incentivizes the physician to keep recertifying, even if further treatment is unnecessary or if treatment by a different provider would be in the patient's best interest.").

the decision maker). This type of arrangement undermines the purposes of the Anti-Kickback Statute—to prevent fraud and protect patient choice.

In reaching this conclusion, we note that the statute itself contains an important limiting principle. Payments made to a physician who certifies care must be paid "in return for" the certification. 42 U.S.C. § 1320a-7b(b)(1)(A); *see also* 42 U.S.C. § 1320a-7b(b)(2)(A) (remuneration must be "to induce" the referral). Put another way, there must be a link between the payment to the physician and the certification. This requirement was clearly satisfied: the evidence showed that Dailey withheld signed Form 485s until he received his monthly check from Chudy.

IV.

Dailey's last challenge concerns the court's denial of his requested jury instructions. "The district court abuses its discretion by refusing to include a requested instruction only if that instruction: (1) is substantively correct; (2) is not substantially covered in the charge given to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense." *United States v. Simkanin*, 420 F.3d 397, 410 (5th Cir. 2005). There is no abuse of discretion "where the instructions actually given fairly and adequately cover the issues presented by the case." *Id.*

As to the proposed instruction regarding "practicing medicine" or "providing care," these issues were not relevant to the charged offenses. Dailey appears to believe these instructions were relevant because the Government alleged that Dailey had misrepresented that patients were "under his care." But Dailey's requested instruction does not define "under his care," which, as Gomez explained, has no definition in Medicare. Whether Dailey practiced medicine or provided care was not at issue in this case.

12

As to the instruction regarding the use of physician assistants, regardless of the relevance of Texas law, an issue we need not decide, Texas law requires that the physician assistant be under the physician's supervision, which did not occur here.  *See* 22 TEX. ADMIN. CODE §§ 185.2, 185.10. Therefore, "[t]he trial court may decline a suggested charge which incorrectly states the law, *is without foundation in the evidence*, or is stated elsewhere in the instructions." *United States v. Robinson*, 700 F.2d 205, 211 (5th Cir. 1983) (emphasis added).

The instructions provided by the district court "fairly and adequately cover the issues presented by the case." *Simkanin*, 420 F.3d at 410.  Dailey has not demonstrated that his requested instructions concerned "an important point in the trial so that the failure to give [them] seriously impair[ed] the defendant's ability to present effectively a particular defense." *Id.*

AFFIRMED.