In the

# United States Court of Appeals

### For the Seventh Circuit

No. 14-2607

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KAMAL PATEL,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 CR 491-5 — **Robert M. Dow, Jr.**, *Judge*.

ARGUED DECEMBER 5, 2014 — DECIDED FEBRUARY 10, 2015

Before FLAUM, EASTERBROOK, and KANNE, *Circuit Judges*.

FLAUM, *Circuit Judge*. Dr. Kamal Patel is a Chicago-area physician who commonly prescribes home health care services for his patients. After federal investigators learned that Patel had been receiving undisclosed payments from Grand Home Health Care ("Grand"), a home care provider used by some of his patients, Patel was charged with six counts of violating—and one count of conspiring to violate—42 U.S.C. § 1320a-7b, otherwise known as the Anti-Kickback Statute.

In relevant part, the Statute makes it illegal to "knowingly and willfully solicit[] or receive[] any remuneration (including any kickback, bribe, or rebate) … in return for referring an individual to a person for the furnishing" of health care services paid for, in whole or in part, by a federal health care program. *Id*. § 1320a-7b(b)(1)(A).

During his bench trial, at the close of the government's evidence, Patel moved for a judgment of acquittal, arguing that he had not "referred" any patients to Grand because there was no evidence that he steered or directed his patients to Grand; rather, the patients independently chose Grand as their provider after Patel prescribed home health care. The district court rejected Patel's argument, holding that, even if a patient had initially chosen Grand, Patel "referred" the patient to Grand when he certified or recertified that the patient needed care, that the care would be provided by Grand, and that Grand could be reimbursed by Medicare for services provided. This certification and recertification occurred each time Patel signed a standardized Medicare form, Form 485, for one of his patients.

On appeal, Patel argues that the district court erred by holding that the certification and recertification, via Form 485, of patients for treatment constitutes a "referral" under the Anti-Kickback Statute. He also argues that even if those certifications were referrals, there was insufficient evidence to conclude that Patel was paid "in return for" certifications, as required by the statute. We affirm.

## I. Background

Patel is an internal medicine specialist who treats approximately twenty elderly patients per day and prescribes home

health care services to about ten patients per month. One of the approximately 10–20 home health care providers used by Patel's patients is Grand, a Chicago-based company. Around 95% of Grand's patients are Medicare beneficiaries; Medicare, the parties have stipulated, is a federal health care program as defined in the Anti-Kickback Statute. In 2002 or 2003, Grand experienced a significant decline in business when some of its partners left to form a competing company, taking most of Grand's patients with them. Prior to that time, Grand had received patients from Patel, but this ceased following the partners' departure. To counteract this downturn, Grand's owners, Nixon Encinares and Maria Buendia, initially tried introducing themselves to numerous doctors in the area, including Patel, in an effort to attract business. After this approach proved unsuccessful, the Grand owners begin offering to pay doctors for referrals of Medicare patients.

Encinares approached Patel, specifically offering to pay him for "referrals." According to Patel, he did not say anything in response to the proposal and "didn't agree with" Encinares. Buendia and Encinares, on the other hand, testified that Patel said something to the extent of "okay" or "yeah" in response to their offer.[1] During a second meeting with Patel, Encinares and Buendia offered to pay Patel for referrals on a per-patient basis. After making this offer,

---

[1] The district court, acting as trier of fact, concluded that it was unnecessary to resolve this factual dispute. The dispute was immaterial to Patel's guilt on the six counts of violating the Anti-Kickback Statute. And, even if Patel did not verbally agree to the arrangement, the district court concluded that he was also guilty of conspiracy because he later manifested his involvement in the conspiracy by accepting payments from Encinares while certifying and recertifying patients to Grand.

Grand began providing home health care services to about 2–4 of Patel's patients per month; a majority of Patel's patients continued to use other providers.

To qualify for Medicare-reimbursed home health care services, a patient must be homebound and suffer from a medical condition or constellation of medical conditions that requires skilled nursing care or therapeutic services. A doctor or nursing facility must initially determine that a patient needs these services. Once this determination is made, the patient or his caregiver must select a provider to furnish the necessary services. Often, a treating physician or nurse will discuss the merits of particular providers with patients. Patients who have previously received home health care services often reselect their previous provider. After a provider is selected, the patient or his doctor contacts the provider and supplies important information, including the patient's name, his diagnosis, and his Medicare number. The provider then assesses the patient's condition and needs, and formulates a treatment plan. To be reimbursed by Medicare for the treatment, the provider must complete and submit to Medicare a Form 485 for each patient; Form 485 is a standardized Medicare form that certifies that home care is medically necessary and outlines a patient's diagnosis, medications, treatment plans, and goals. After filling out this information, providers must procure the signature of the patient's primary care physician on each Form 485 before the provider can bill Medicare. A signed recertification form is necessary for home care that lasts longer than the initial 60-day certification period. Home health care providers can—and often do—treat patients prior to receiving a signed Form 485, but they cannot be reimbursed by Medicare until the Form has been signed. By signing a Form 485, a physician certifies that

"the patient is confined to his/her home and needs intermittent skilled nursing care, physical therapy and/or speech therapy or continues to need occupational therapy," and that the physician has "authorized the services on this plan of care and will periodically review the plan."

Both before and after Grand began offering Patel kickbacks, Patel used the following process when prescribing home health care for a patient. First, Patel made the initial determination that the patient required home health care services. This initial decision is not at issue in this case—it is undisputed that all of Patel's patients who were treated by Grand needed home health care. After this initial determination was made, a provider needed to be chosen. Patel did not personally discuss the selection of providers with patients or their family members, either as an initial matter or as part of recertification. Rather, his patients discussed home health care options with Patel's medical assistant, Jeanette Sungvoom. Patel did not tell Sungvoom which provider to recommend. Sungvoom gave patients an array of 10–20 brochures from various providers. The brochures were given to Patel's office by the providers, but it is unclear whether Sungvoom and Patel included every brochure that they were offered. One of the brochures provided by Sungvoom was Grand's, but the government does not contend that it was included in the array because Grand had offered Patel kickbacks. Each patient independently chose a provider from those in the array. After a provider was selected, Sungvoom called or faxed the provider with the name of the patient, his diagnosis, and his Medicare number. The fax cover pages from Patel's office bore the subject line "new referral" and the body of the faxes contained prescriptions for home

health care signed by Patel or by Sungvoom, with Patel's authorization.

If the patient selected Grand as his home health care provider, Grand would then send one of its nurses to assess the patient and complete an "OASIS" form to document the assessment. Grand would devise a treatment plan and fill out most of a Form 485 for that patient. Grand often began providing the proposed services before Patel signed the Form 485. Encinares met with Patel on a monthly basis to have him sign Form 485s. During these meetings, Encinares paid Patel cash. The amount of cash was equivalent to $400 for each signed Form 485 representing a new admission to Grand and $300 for each signed recertification. The district court found that Patel would have signed the Form 485s for each of these patients even if they had not selected Grand. It noted, however, that on at least one occasion Patel indicated over the phone that he was not ready to sign the forms for patients who selected Grand until Encinares was able to bring cash along with the forms. In her office, Buendia kept handwritten notebooks keeping track of Patel's patients being treated by Grand, as well as Grand's payments to Patel. Buendia and Encinares would refer to these notebooks each month to determine how much money Patel was due. The notebooks contain entries reflecting multiple payments of over $1,000 to "Dr. Patel" or "Dr. P." In addition to normal cash payments, Patel was also at times compensated by Grand in the form of incremental loan forgiveness for an $8,000 loan Patel previously received from Grand.

The government began investigating Grand for health care fraud in the spring of 2011. Encinares and Buendia quickly agreed to cooperate in the government's investiga-

tion of others taking part in their scheme by recording telephone calls and meetings with those individuals. Encinares recorded several phone conversations and three meetings with Patel, which Encinares testified were typical of their prior meetings. During these interactions, Patel frequently sounded nervous. In their recorded meetings, Patel signed Form 485s and Encinares gave Patel cash. During one recorded phone call, on May 10, 2011, Patel said, "I was wondering if we could meet for paperwork today." Encinares replied by stating that money was "tight" for Grand, to which Patel responded, "So you're not ready for the paperwork right now."

On November 13, 2012, the government filed a 42-count indictment against Patel, Encinares, Buendia, and others alleging violations of the Anti-Kickback Statute. Patel was charged with six counts of violating the Statute and one count of conspiracy to violate the Statute. A three-day bench trial began on June 10, 2013. The next day, at the close of the government's case in chief, Patel filed a motion for a judgment of acquittal on all counts, arguing that he had not made any "referrals" to Grand. The district court took the motion under advisement and continued with the trial.

On February 19, 2014, the district court denied Patel's motion for judgment of acquittal and found him guilty on all counts. Patel was sentenced to serve eight months' imprisonment and 200 hours of community service, and was required to forfeit $31,900 of kickback payments. After sentencing, the district court granted Patel's motion for bond pending appeal.

## II. Discussion

### A. Definition of "Referring"

The Anti-Kickback Statue is designed to prevent Medicare and Medicaid fraud. According to the Health Resources and Services Administration, the Statute was enacted to "protect the Medicare and Medicaid programs from increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care or necessity of services." Health Res. & Serv. Admin., Program Assistance Letter 1995-10, *Guidance on the Federal Anti-Kickback Law*, available at http://bphc.hrsa.gov/policiesregulations/policies/pal199510.html (last visited February 2, 2015); *see also United States v. Borrasi*, 639 F.3d 774, 781 (7th Cir. 2011) (explaining that the Anti-Kickback Statute was "designed to help combat health care fraud"). The Statute has another purpose as well—to protect patients from doctors whose medical judgments might be clouded by improper financial considerations. *See* Health Res. & Serv. Admin., *supra* ("The law seeks to … preserve freedom of choice and preserve competition.").

The provision of the Anti-Kickback Statute at issue in this case states:

> whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal

> health care program [shall be guilty of a felo-
> ny].

42 U.S.C. § 1320a-7b(b)(1)(A). This appeal requires us to interpret the meaning of the term "referring"—which is not defined in the statute—and specifically to decide whether Patel referred his patients to Grand each time he signed Form 485 certifications and recertifications, thereby allowing Grand to be reimbursed by Medicare for services provided to those patients.

Patel argues that, in the context of the Anti-Kickback Statute, the word "refer" means to personally recommend to a patient that he seek care from a particular entity. In Patel's view, a physician does not refer a patient when the patient, with no input from the physician, independently chooses a provider. Therefore, because there is no evidence that Patel ever urged any of his patients to use Grand, he argues that he cannot be guilty of violating the Statute.[2] The government, in contrast, argues for a broader reading of the term

---

[2] Under this theory, Patel would also be innocent of conspiracy to violate the Anti-Kickback Statute even if he had agreed to be paid in return for certifications and recertifications, as this would not be a conspiracy to be paid in return for *referrals*. However, under Patel's theory, Patel could still be guilty of conspiracy if he agreed to be paid in return for *recommending* his patients to Grand, but never actually carried out this plan. The district court did not determine whether Patel entered into such an agreement because the court found Patel guilty of conspiracy for a different reason: certifications and recertifications are referrals, meaning that Patel manifested his agreement to an illegal conspiracy by accepting payments in exchange for these certifications. Because we ultimately agree with the district court's legal determination, as well as its factual conclusion that Patel was paid in return for referring patients, we also agree with the district court's conclusion on the conspiracy count.

"refer," which includes not only a doctor's recommendation of a provider, but also a doctor's *authorization* of care by a particular provider. Under this reading, Patel referred his patients to Grand by signing Form 485 certifications and recertifications. We agree with the government's interpretation.

We review issues of statutory construction de novo. *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008). When interpreting the meaning of undefined statutory terms, the "cardinal rule is that words used in statutes must be given their ordinary and plain meaning." *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000). To determine the plain meaning of words, we frequently look to dictionary definitions. *Id*. We also consider the construction of similar terms in other statutes, *id*., as well as the purpose of the statute being interpreted. *Id*. at 1002.

Patel's central argument is that the most common usage of "refer" in the medical context is a doctor's recommendation that a patient see a particular specialist or provider, and that this is the behavior that Congress targeted when it enacted the Anti-Kickback Statute. Indeed, one dictionary defines "referral"[3] as "the process of directing or redirecting (as a medical case or a patient) to an appropriate specialist or agency for definitive treatment." MERRIAM-WEBSTER DICTIONARY ONLINE, *available at* http://www.merriam-webster.com/medical/referral (last visited February 2, 2015).

---

[3] The Statute uses the word "referring," but both parties frequently discuss the base form of that verb, "refer," as well the noun form, "referral." We agree with the parties that these terms are interchangeable for the purposes of our analysis.

Another defines it as "the directing of a patient, usually by a general practitioner, to a consultant or institution for specialist treatment." OXFORD ENGLISH DICTIONARY ONLINE, *available at* http://www.oed.com/view/Entry/160858 (last visited February 2, 2015).

But although Patel's proposed definition of "referral" is a common usage of the term, it is not the only common usage. Often, people use the word "referral" to describe a doctor's authorization to receive medical care, even when the doctor is not the one choosing the provider of that care. For example, in Illinois, a physical therapist cannot provide treatment without a physician's "referral." 225 Ill. Comp. Stat. 90/17(1)(V). A "referral," in turn, is defined as "a written or oral *authorization* for physical therapy services for patient by a physician." *Id*. 90/1(6) (emphasis added). Presumably, many patients in Illinois visit their doctors seeking physical therapy and with a specific therapist already in mind. In such a case, the patient does not need a recommendation from his physician, but still needs a referral—that is, an authorization—before he can be treated by his chosen therapist.

This more expansive definition of "referral" is frequently used in the medical context. Indeed, in this case, Patel's own office often identified a patient as a "new referral" when faxing new patient information to Grand, even though Patel had played no part in the patient's selection of Grand. Courts, including our own, often employ this usage of the word. *See, e.g.*, *Moran v. Rush Prudential HMO, Inc.*, 230 F.3d 959, 963 (7th Cir. 2000) (ERISA plaintiff sued HMO after HMO-affiliated primary care physician denied her "request for [an] out-of-network referral to consult with" a specific

surgeon chosen by the plaintiff); *McElhone v. Sebelius*, No. C 12-06090, 2014 WL 1048583, at *2 (N.D. Cal. Mar. 14, 2014) ("Plaintiff also requested an out-of-network referral to Physiatrist Sherman Tran at Stanford Medical Center."); *Nealy v. U.S. Healthcare HMO*, 711 N.E.2d 621, 622–23 (N.Y. 1999) ("When Dr. Yung informed him during one or both of these visits that he should see a cardiologist, Mr. Nealy requested a referral to Dr. Green … . Dr. Yung allegedly assured his patient that he would submit a request to U.S. Healthcare to approve an out-of-plan referral … ."). Patel contends that these cases[4] do not support the government's position be-

---

[4] The government argues that our decision in *United States v. Polin*, 194 F.3d 863 (7th Cir. 1999), forecloses Patel's proposed definition of "referring," but we disagree. According to the government, the word "refer" should be interpreted broadly because, in *Polin*, we agreed with the government's statement that "refer is to recommend, is to turn over, is to make a selection, is to give the business away." *Id*. at 866. For multiple reasons, we are unpersuaded. First, no part of this expanded definition clearly encompasses Patel's actions in this case; rather, they mostly have to do with recommending that a patient see a particular provider. Second, we did not adopt this definition in *Polin*—we merely said that the government's counsel had "aptly summarized" the term. *Id*. Finally, this language is taken out of context. In *Polin*, the defendants had paid money to a pacemaker sales representative—a non-physician—in return for the representative's referral of patients. *Id*. at 864. The indictment reflected the language of § 1320a-7b(b)(2)(A), which criminalizes paying kickbacks for certain "referrals." The defendants claimed that they had been charged under the wrong subsection of the Statute, arguing that only physicians can make "referrals." Instead, they argued that they should have been charged under subsection (B) of the same statute, which criminalizes "recommendations," which non-doctors can make. We held that these subsections were not "separate subsections that address 'different and non-overlapping' types of conduct," and thus that both subsections could apply to doctors or non-doctors. *Id*. at 866. In referencing the government's suggested definition of "referring," we were merely stating

cause, in each of them, the physician was involved in the selection of a specific provider prior to treatment, regardless of who identified the specialist in the first instance. That is factually incorrect. In each of these cases, the doctor was not involved in the selection of a provider—the patient independently chose a specific provider. All the physician did was authorize care by the patient's chosen provider. Patel is correct that it does not matter who first identifies the care provider; what matters is whether the doctor facilitates or authorizes that choice. In each of the above cited cases, the doctor acted as a gatekeeper—without his approval, the patient could not receive treatment from the provider the patient had selected. Exercising this gatekeeping role is one way that doctors refer their patients to a specific provider.

Both parties point to the definition of "referral" in a related federal statute, the Stark Act, 42 U.S.C. § 1395nn, for support. The Stark Act is a civil statute that prohibits referrals of health services for Medicare and Medicaid patients to entities in which the physician or a member of his family has a financial interest. It defines "referral" to include "the request by a physician for a consultation with another physician" and "the request or establishment of a plan of care by a physician which includes the provision of [health services]." *Id*. § 1395nn(h)(5)(A)–(B). Regulations interpreting that definition, in turn, define "referral" to include "the request by a physician for, or ordering of, *or the certifying or recertifying of the need for*, any designated health service for which payment may be made under Medicare Part B." 42 C.F.R. § 411.351 (emphasis added). Under this definition, Patel's certifying

_____

that "refer" and "recommend" are synonyms—precisely what Patel argues in this case.

and recertifying of patients by signing Form 485s would seem to constitute referrals. Patel argues, in contrast, that the Stark Act definition provides support for his reading of the Anti-Kickback Statute. First, he argues that Congress needed to expressly define "referral" so broadly in the Stark Act because the ordinary meaning of the term is much narrower. In contrast, according to Patel, Congress intended the word to have its "ordinary," narrower meaning in the Anti-Kickback Statute, and therefore did not feel a need to further define the term. But it is equally possible that Congress defined "referral" in the Stark Act as it did because Congress believes that is what the word means. At the very least, the Stark Act definition suggests that Congress considers the government's broad reading of the term "referral" to be a permissible one. Patel's second argument regarding the Stark Act is that the purpose of that Act supports a broader definition of "referral," while the purposes of the Anti-Kickback Statute do not. He argues that in the context of a self-referral (the target of the Stark Act), an expansive definition of "referral" is necessary because a self-referring physician has an ongoing financial interest in the health care provider that treats the patient. But Patel *also* had an ongoing financial interest in the treatment of his patients by Grand—he received a kickback for every recertification he signed.

Dictionary definitions and the construction of a related statute leave us with two plausible readings of the Anti-Kickback Statute. Upon considering the Statute's main purposes, however, we are convinced that Congress intended the Statute to extend to the certification and recertification of patients for government-reimbursed care. The central purpose of the Statute is to prevent Medicare and Medicaid fraud. Patel contends that there was no harm to the Medicare

system in this case, as the government concedes that every one of his patients that went to Grand actually needed home health care services. But this is irrelevant[5] to our *legal* interpretation of the meaning of the statute, because even if the Medicare system suffered no losses in this instance, the danger of fraud at the certification and recertification stages is quite clear. At the certification stage, a physician could refuse to certify a patient to a patient-chosen provider unless the provider paid the physician a kickback. This behavior could increase the cost of care. It could also contravene the second purpose of the Anti-Kickback Statute—protection of patient choice—by interfering with the patient's choice if the selected provider refused to pay.

Or, consider a patient who goes to his physician seeking authorization to visit a certain provider. If that physician will receive a kickback for a certification to that provider, he will have an incentive to certify the patient even if he thinks that the care is unnecessary or believes that the patient-chosen provider is substandard. All of these same concerns arise at the recertification stage as well: a doctor being paid for each recertification will be incentivized to authorize unnecessary further care and to ensure that the patient continues to use the same provider, even if that provider gives poor care.

Additionally, as the district court noted, if Patel is correct that only steering a patient to a particular provider constitutes a referral, a physician would be free to accept a kickback each time he recertified a patient for treatment by a

---

[5] There is no allegation in this case that Grand provided subpar treatment to any patients certified by Patel or that those patients suffered any tangible harm. This is also irrelevant to our legal determination.

previously selected home health care provider. This outcome was recently rejected by the Eleventh Circuit in *United States v. Vernon*, 723 F.3d 1234 (11th Cir. 2013). In *Vernon*, the defendant argued that a patient could not be "referred" to a provider within the meaning of the Anti-Kickback Statute if he was already a patient of that provider. The court rejected this argument, stating that it "would lead to the absurd result that the first kickback payment for a referral is unlawful, but future kickback payments for the same patient are lawful because they are not for an initial 'referral.'" *Id*. at 1256. Such a result is undesirable because the possibility of a kickback for each recertification incentivizes the physician to keep recertifying, even if further treatment is unnecessary or if treatment by a different provider would be in the patient's best interest. Patel argues that *Vernon* is distinguishable from this case because the patients in *Vernon* did not choose or even know the identity of their provider. Thus it was the defendant, a "patient advocate," who continued to choose where to fill her clients' prescriptions whenever she filled a prescription at the pharmacy paying her kickbacks. Patel argues that he, in contrast, played no role in his patients' initial selection of Grand or their decision to continue using Grand. True, but Patel chose *whether* his patients could go to Grand at all, which we think is just as important. Patel acted as a gatekeeper to federally-reimbursed care. Without his permission, his patients' independent choices were meaningless. Regardless, Patel's proposed distinction from *Vernon* does not eliminate the absurdity that can result from his proposed definition. Even if the patient makes the initial choice of a provider, a physician could take advantage of his power to veto that choice at the certification or recertification stage, harming Medicare, the patient, or both.

These concerns persuade us that, in passing the Anti-Kickback Statute, Congress intended to criminalize the receipt of kickbacks in return for a physician's certification or recertification, through a signed Form 485, that a patient requires Medicare-reimbursed care. The word "referral" is commonly used—including by Congress in the Stark Act—in a way that extends to such authorizations. Moreover, a narrow definition of the term would defeat the central purposes of the Anti-Kickback Statute.

Patel offers a number of other arguments in favor of his proposed reading of the Statute, none of which we find convincing. First, he points out that the word "referring" must be read in the context of the rest of the statutory subsection, which criminalizes the solicitation or receipt of a bribe in return for "referring [a patient] *to a person*" for medical care. 42 U.S.C. § 1320a-7b(b)(1)(A) (emphasis added). This, he argues, indicates that Congress meant to address only situations in which a doctor recommends a specific provider, not a situation where the patient independently chooses a provider after the physician issues a generic order for treatment. But this is beside the point—Patel was not convicted for writing a generic order. Rather, he was convicted because he authorized his patients' treatment by a *specific* provider—the Form 485s signed by Patel specified Grand as his patients' caregiver and recipient of Medicare funds. Whether these actions were referrals is a separate question from whether they were referrals *to a person*. And the fact that Patel's patients independently chose the "person" from whom they wanted services does not mean that Patel's subsequent certifications, assuming they were referrals, were not referrals to that person.

Patel's next argument is that it makes no sense to call a certification a "referral" when it is made weeks after the patient began receiving treatment from the selected provider, as occurred in this case. This scenario, however, makes sense once one considers the main purpose of the Anti-Kickback Statute—to prevent kickbacks from influencing the provision of services that are *charged to Medicare*. It stands to reason that the Statute should apply to the actions—certification and recertification—which directly allow Medicare to be charged. Even if treatment has begun, a doctor deciding whether to sign a Form 485 wields just as much power over Medicare costs and his patients' health as a doctor deciding where to direct his patient.

As the district court noted, Patel "was a financial gatekeeper as well as a medical one":

> Defendant's patients could not initiate or continue treatment from Grand on their own; without Defendant's authorization and certification, the patients could not receive treatment from Grand, regardless of their preferences. Even if Defendant had nothing to do with a patient's decision to choose Grand in the first instance, his signature on the Medicare-required forms not only confirmed the patient's decision to go to Grand but also placed his imprimatur on the need for services that would be billed to and paid for by Medicare.

*United States v. Patel*, 17 F. Supp. 3d 814, 827 (N.D. Ill. 2014). Given these considerations, it is irrelevant that Patel's patients received treatment from Grand before he signed their Form 485s. Even though care had begun, Grand could not

have charged Medicare for that care prior to receiving a signed Form. The referral process, as far as Medicare is concerned, continues until the Form is signed. Patel could have withheld his signature in an attempt to extort larger payments from Grand. In fact, it seems that Patel once threatened to do just that when Encinares lacked the money to pay him. If Patel had decided not to sign the forms, Grand could not have billed Medicare. In other words, the prospect of a kickback gave Patel an increased incentive to charge Medicare for these services—exactly the type of incentive that Congress sought to eliminate by passing the Anti-Kickback Statute.

Patel also argues that the government's broad definition of "referring" would effectively eliminate the word from the Statute. Under the government's interpretation, he argues, it would be illegal for a physician to receive *any* remuneration from a person who treats the physician's patients because the government's interpretation allows a doctor to be prosecuted even when he does not direct a patient to go to the provider making the payment. For example, Patel claims, a doctor could be convicted if he is paid to give a speech at a hospital and some of his patients are later treated by that hospital.[6]

---

[6] In Patel's example, the doctor also "compliments the hospital in the speech." We assume Patel included this detail to suggest that the patients in the hypothetical choose to go to the hospital *because* of the doctor's compliments—in other words, because the doctor, in a way, recommended the hospital to his patients. However, Patel's argument is that we are reading the word "referring" out of the Statute completely. If he is right, it should not matter whether the doctor recommends the hospital to his patients or not. As we explain above, the doctor in Patel's hypothetical cannot be convicted whether he affirmatively directs his

This argument, however, completely overlooks the Statute's requirement that a kickback be paid "in return for" a referral. § 1320a-7b(b)(1)(A). Payments made for legitimate services (such as giving a speech) cannot be construed as an illegal kickback. *Borrasi*, 639 F.3d at 780–81. Patel's argument simply has nothing to do with the scope of the term "referring." The doctor in Patel's hypothetical neither recommended the hospital to his patients nor acted as a gatekeeper for his patients' care there. The construction of "referring" that we adopt here, in contrast, requires the doctor to do *something* that either directs a patient to a particular provider or allows the patient to receive care from that provider. And even if the doctor in Patel's hypothetical *had* steered his patients to the hospital, the doctor could not be prosecuted because he was not paid "in return for" referrals.

Patel's final argument is that the meaning of "referring" in the Anti-Kickback Statute is ambiguous, and thus should be interpreted in his favor under the rule of lenity. The Supreme Court has recently stated that the rule of lenity applies only if, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich v. Spears*, 133 S. Ct. 2191, 2209 (2013) (citation and internal quotation marks omitted). The rule does not apply merely because a "statute's text, taken alone, permits a narrower construction." *Abramski v. United States*, 134 S. Ct. 2259, 2272 n.10 (2014). No grievous ambiguity exists here. The definition of "referral" put forth by the government is in common usage, including by Congress it-

---

patients to the hospital, merely compliments the hospital in a speech, or does nothing at all that causes his patients to use the hospital.

self. Most importantly, we think that Congress intended for the Statute to apply to certifications and recertifications for Medicare-reimbursed care. To hold otherwise would defeat Congress's purpose in passing the statute.

Moreover, the purposes underlying the rule of lenity do not justify the rule's application here. "Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal … ." *Liparota v. United States*, 471 U.S. 419, 427 (1985). Patel argues that adopting the government's definition of "referral" will lead to the prosecution of many unsuspecting physicians and will lead others to fear that their actions are possibly illegal. This argument, though, is tied up with Patel's mistaken belief that, if we affirm, doctors will be exposed to prosecution when their patients use a provider from whom the physician has previously received a legitimate payment. As described above, however, this concern is overblown. In fact, the government's definition only exposes doctors to liability for a clearly delineated set of actions—receiving or soliciting kickbacks in return for directing a patient to a provider, or for certifying or recertifying patients for Medicare-reimbursed care. Patel's nervous behavior suggests he knew that these actions were illegal. Other doctors should know that this behavior is illegal as well—the Department of Health and Human Services issued a Special Fraud Alert to the health care provider community twenty years ago stating that "[p]ayment of a fee to a physician for each plan of care certified by the physician on behalf of the home health agency" is a form of illegal kickback. Home Health Fraud, and Fraud and Abuse in the Provision of Medical Supplies to Nursing Facilities, 60 Fed. Reg. 40,847, 40,848 (Aug. 10, 1995). The Department noted that such kickbacks threaten

patients' freedom of choice and increase the cost of care—precisely the reasons that we hold certifications and recertifications are "referrals" under the Anti-Kickback Statute.

## B. Sufficiency of the Evidence

Finally, Patel argues that, even if he "referred" his patients to Grand when he signed their Form 485s, there was insufficient evidence to demonstrate that he received money from Grand *in return for* signing those forms, as required by the statute. Rather, Patel argues, Grand paid Patel to induce him to recommend to his patients that they choose Grand as their home health care provider. In other words, Patel says that he was paid for one type of referral (a recommendation), but gave Grand an entirely different type (a certification); he thus was not paid "in return for" the referral he actually gave. According to Patel, the government needed to prove beyond a reasonable doubt that Patel was paid in return for his signature on the Form 485s, and it has failed to do so. And although Patel admits he was paid at the same time that he gave the signed forms to Encinares, and the payment amount was perfectly correlated with the number and type of forms, he claims that this was a mere convenience—the forms functioned as a proxy for actual recommendations made by Patel to his patients.

In reviewing the sufficiency of the evidence, we consider the evidence "in the light most favorable to the government, drawing all reasonable inferences in the government's favor." *United States v. Lee*, 558 F.3d 638, 641 (7th Cir. 2009). We overturn a conviction based on insufficient evidence "only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United*

*States v. Johnson*, 729 F.3d 710, 714 (7th Cir. 2013) (citation and internal quotation marks omitted).

Even accepting Patel's premise that the government had to prove he was paid specifically for his signatures, there was sufficient evidence such that a reasonable factfinder could conclude that Grand paid him for that reason. The payments were literally exchanged for these signatures and the payment amount was calculated based on the number and type of Patel's authorizations. Based on this evidence, a reasonable factfinder could conclude that the payments were made in return for the signatures. More importantly, the fact that Patel was paid for recertifications—in addition to initial certifications—strongly suggests that Grand was paying him for his signatures, not for patient recommendations. If Grand wanted to pay Patel for recommendations, why pay him for *both* certifications *and* recertifications? Any payment due for a recommendation could be fully paid upon certification; recertified patients, by definition, were not new patients that Patel had recommended to Grand. Presumably, Grand paid Patel for recertifications because his signatures on those forms were an added bonus to the company—Grand paid Patel so that he would allow his patients to continue using Grand.

Patel also suggests that he should not have been convicted because he would have signed the certification forms with or without the promise of kickbacks. This, however, is irrelevant. The Anti-Kickback Statute prohibits a doctor from receiving kickbacks that are made in return for a referral. It does not require that the referral be made in return for a kickback. A reasonable factfinder could conclude that Patel "willfully and knowingly" received a kickback paid by

Grand because Patel gave Grand referrals; that was all the government needed to prove.

### III. Conclusion

We AFFIRM the judgment of the district court.